**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------------------x
MARIA and WILLIAM CULLEN, and THEIR THREE
CHILDREN, WILLIAM, JR., KATHERINE, and SARAH,

<table>
<tr><td>Plaintiffs,</td><td>03-CV-2168 (CS)</td></tr>
<tr><td>- against -</td><td><b>MEMORANDUM DECISION<br>AND ORDER</b></td></tr>
</table>

VILLAGE OF PELHAM MANOR, JOHN PIERPONT,
VILLAGE MANAGER, SAMUEL DELUCA and DIANE
DELUCA,

                          Defendants.
----------------------------------------------------------------------x

<u>Appearances</u>:

Tembani S. Xaba, Esq.
Law Office of Tembani S. Xaba
New York, New York
*Counsel for Plaintiffs*

Jonathan S. Sanoff, Esq.
H.B. Woolfalk & Associates, P.C.
Scarsdale, New York
*Counsel for Defendants Samuel and Diane DeLuca.*

Anthony B. Corleto, Esq.
Brian S. Frank, Esq.
Wilson, Elser, Moskowitz, Edelman & Dicker LLP
Stamford, Connecticut
*Counsel for Defendants Village of Pelham Manor and John Pierpont*

<u>Seibel, J.</u>

On November 25, 2008, Magistrate Judge Lisa Margaret Smith issued a Report and

Recommendation ("Report") recommending that the Court deny Defendants Sam and Diane

DeLuca's motion for summary judgment and *Daubert* motions, and grant in part Defendants

Village of Pelham Manor and John Pierpont's ("Pelham Defendants") (collectively with the

DeLucas, "Defendants") motion for summary judgment. (Doc. 132.)  The DeLucas and the

Pelham Defendants filed objections to the Report, (Docs. 136 and 137, respectively), and ask the

Court to grant summary judgment on all Defendants' claims.  Pursuant to 28 U.S.C. § 636 and

Rule 72 of the Federal Rules of Civil Procedure, this Court has conducted a review of the Report

and Defendants' objections, and has concluded as follows:

> (1) the DeLucas' motion for summary judgment is GRANTED as to
>
>> (a) Plaintiffs' adverse possession claims,
>>
>> (b) Plaintiffs' trespass claims, and
>>
>> (c) the DeLucas' first, second, and third counterclaims (hereinafter, the "boundary
>>
>> counterclaims");
>
> (2) the Pelham Defendants' motion for summary judgment is DENIED in part and
>
> GRANTED in part, as set forth below;
>
> (3) the Plaintiffs' motion for summary judgment and *Daubert* motions are DENIED; and
>
> (4) the DeLucas' *Daubert* motions are DENIED.

**I.**     **Background**

Familiarity with the history of this case is presumed.  The relevant facts, briefly stated,

are as follows.  Plaintiffs Maria and William Cullen ("the Cullens") reside at 50 Shore Road in

Pelham Manor, New York, and filed this suit on March 28, 2003, over a property dispute with

their neighbors, the DeLucas, who reside to the south at 42 Shore Road.  The Cullens allege that

they have a rightful claim to a wedge-shaped portion of land (the "disputed property" or

"disputed parcel") on the north side of a stone wall that physically separates the Cullens' and

DeLucas' properties.  The DeLucas claim record title to the wedge-shaped piece of land, while

the Cullens assert that the stone wall marks the boundary between the two properties, making the

2

disputed property theirs.  The Cullens' claims against the Pelham Defendants arise from several allegedly unlawful entries into the Cullen home and property by John Pierpont, the Pelham Village Manager, in 2001, and damage allegedly arising from water runoff coming from a park near the Cullen home.

The Cullens assert an assortment of state and federal claims, including adverse possession, against the DeLucas, and substantive claims under 42 U.S.C. § 1983 against the Pelham Defendants.  Each party moved for summary judgment on their respective claims and counterclaims, and the DeLucas and Cullens also brought *Daubert* motions seeking to disqualify each other's experts.  (*See* Docs. 98-101, 117, 119.)  Magistrate Judge Smith recommended in her Report that the Court deny the Cullens' and DeLucas' motions for summary judgment and *Daubert* motions in their entirety, but grant in part the Pelham Defendants' motion for summary judgment.  Only the DeLucas and the Pelham Defendants have filed objections to the Report. No response to the objections was filed.

**II.    Discussion**

**A.    Standard for Reviewing a Magistrate Judge's Report and Recommendation**

In reviewing a Report and Recommendation, a district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C § 636(b)(1)(C).  If no timely objection is made, a Report and Recommendation may be modified or set aside by the district court only when it is "clearly erroneous or contrary to law." 28 U.S.C. § 636(b)(1)(A).  Under Rule 72(b) of the Federal Rules of Civil Procedure, a party may file "specific written objections" to a Magistrate Judge's proposed findings and recommendations, in which case the district court has an obligation to make a *de novo* determination as to those portions of the Report and Recommendation to which objections were

made. 28 U.S.C. § 636(b)(1)(C); *Grassia v. Scully,* 892 F.2d 16, 19 (2d Cir. 1989).  Accordingly, the Court reviews Defendants' objections to the Report's recommendations on summary judgment under a *de novo* standard.

The Report's conclusions on the Parties' *Daubert* motions, however, are subject to the standard of review set forth in Rule 72(a) of the Federal Rules of Civil Procedure, which provides that a magistrate judge's finding as to a non-dispositive, pretrial matter may be modified or set aside by the district court only when it is "clearly erroneous or contrary to law." Fed. R. Civ. P. 72(a) 28 U.S.C. § 636(b)(1)(A).  A finding is "clearly erroneous" only "when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."  *See Garcia v. Teitler*, 443 F.3d 202, 211 (2d Cir. 2006) (citing *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)).

### B.    Summary Judgment Standard

Summary judgment is warranted when the moving party shows that there is no genuine issue as to any material fact and that it is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(c).  "A dispute about a genuine issue exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor."  *Beyer v. County of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008) (internal quotation marks omitted).  The trial court therefore "resolve[s] all ambiguities, and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment." *Cifra v. Gen. Elec. Co.*, 252 F.3d 205, 216 (2d Cir. 2001).  "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial," as Defendants have, "the movant may satisfy this burden by pointing to an absence of evidence to support an essential element of the nonmoving

party's claim." *Gummo v. Village of Depew*, 75 F.3d 98, 107 (2d Cir. 1996) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).  Then the onus shifts to the party resisting summary judgment to present evidence sufficient to satisfy every element of the claim.  The non-moving party is required to "go beyond the pleadings" and "designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (internal quotation marks omitted); *see Holcomb v. Iona College*, 521 F.3d 130, 137 (2d Cir. 2008).  The Court presumes familiarity with the Report and addresses each of Defendants' Objections in turn.

### C.   The DeLucas' Motion for Summary Judgment

The DeLucas object to the Report's recommendation that this Court deny summary judgment on (1) Plaintiffs' adverse possession claim, (2) Plaintiffs' trespass claim, and (3) the DeLucas' boundary counterclaims.

### 1.   Adverse Possession

The Cullens claim title by adverse possession to property that, according to several land surveys, lies on the DeLucas' side of the boundary line.  Under New York law, "in order to acquire title to real property by adverse possession, the possessor must establish by clear and convincing evidence that the character of the possession is hostile and under a claim of right, actual, open and notorious, exclusive and continuous . . . for the statutory period of 10 years." *Corigliano v. Sunick*, 867 N.Y.S.2d 588, 589 (App. Div. 2008) (internal quotation marks omitted).  It is undisputed that Plaintiffs first occupied 50 Shore Road in 2001, and their lawsuit laying claim to the disputed parcel by adverse possession commenced less than two years later.  Plaintiffs can therefore only establish a claim of adverse possession by "tacking on" their period of possession to that of their predecessors in title, Warren and Bradley Flynn ("the Flynns").

(Report at 9 (citing *Brand v. Prince*, 35 N.Y.2d 634, 637 (N.Y. 1974).)  Moreover, when a claim of adverse possession is not based upon a written instrument, as is the case here, the possessor is required to show that the parcel was either "usually cultivated or improved" or "protected by a substantial enclosure." *Corigliano*, 867 N.Y.S. 2d at 589 (quoting N.Y. Real Property Actions and Proceedings Law ("RPAPL") § 522).

The DeLucas assert that the Report "failed to perform a core duty of decision-making . . . where the substantive law imposes a heightened clear and convincing burden of proof on plaintiffs." (DeLuca Defendants' Objections to Magistrate Judge's November 28, 2008 Report and Recommendation ("DeLuca Defs. Objs.") 2.)  Seizing on the Report's finding that the record was "unclear" and "conflicting," the DeLucas argue that Magistrate Judge Smith "could not properly have found that plaintiffs' proof was clear and convincing," (DeLuca Defs. Objs. 4), and specifically attack the Report's findings that the record was "unclear" with respect to whether the Flynns, Plaintiffs' predecessors in title, adversely possessed the disputed property and/or actually turned over possession of the disputed property with the rest of the property to the Cullens.[1]  (Report at 11-13.)  The DeLucas contend that uncertainty in the record is fatal to Plaintiffs' adverse possession claims, which must be proven by clear and convincing evidence.

The argument that "an unclear record mean[s] that plaintiffs failed to prove adverse possession by clear and convincing evidence," (DeLuca Defs. Objs. 5), is inapt at this stage.  A party asserting adverse possession need not prove its case by clear and convincing evidence to survive summary judgment, as it would have to do at trial.  Indeed, at the summary judgment stage, an "unclear" record containing "conflicting" evidence militates against awarding summary

---

[1] Warren Flynn occupied 50 Shore Road from his birth, in 1956, until the sale to the Cullens in 2001; his brother, Bradley Flynn, lived there from 1953 to 1976.  (Report at 12.) Unless otherwise noted, however, their occupancy of 50 Shore Road is treated as unitary.

judgment to either party.  *See Piasecki v. Stauble*, 557 N.Y.S.2d 546, 547 (App. Div. 1990)

("Summary judgment is an improper remedy in an adverse possession action where material

issues of fact remain.").  Summary judgment is appropriate, however, if no issues of material fact

exist.

While I do not adopt the DeLucas' view that an unclear factual record requires summary

judgment in their favor, I respectfully disagree with Judge Smith's conclusion that the factual

record is unclear here.  As to the substantive issues arising from the adverse possession claim –

whether the Flynns intended to and actually turned over possession of the disputed property to

the Cullens, and whether the Flynns cultivated or improved the property as required by N.Y.

RPAPL § 522 – there are no factual disputes that prevent the granting of summary judgment.

### a.  Actual conveyance of disputed property

Generally, "successive adverse possessions of property . . . may be tacked if it appears

that the adverse possessor *intended to and actually turned over possession* of the undescribed

part with the portion of the land included in the deed."  *Eddyville Corp. v. Relyea,* 827 N.Y.S.2d

315, 318 (App. Div. 2006) (emphasis added).  The omission of the disputed parcel from a deed

of transfer can, however, weaken or undermine altogether an argument that the original adverse

possessor "intended to and actually turned over possession" of the disputed parcel.  *Brand*, 35

N.Y. 2d at 637; *see Congregation Yetev Lev D'Satmar, Inc. v. County of Sullivan*, 59 N.Y.2d

418, 425 n.2 (1983) (intent of predecessor in title unclear where predecessor exercised

unrestricted use of land but deed "acknowledged exclusion of the [disputed] parcel from the

interests conveyed."); *Staples v. Schnackenberg*, 148 A.D. 161, 162-63 (1911) (where deed

description put border of parcel at border of disputed lot, deed "expressly excluded the [disputed

parcel], there was no privity of contract between [grantee] and his grantor with respect to it, and

[grantee's] possession cannot be tacked onto [grantor's] to make up the necessary [period for] . . . adverse possession."); *Comrie, Inc. v. Holmes*, 836 N.Y.S.2d 377, 379 (App. Div. 2007) ("[W]arranty deed by which plaintiff received title to its property . . . expressly excluded the disputed parcel from its legal description thus providing an additional basis upon which to dismiss plaintiff's adverse possession claim."). The Cullens and DeLucas agree that the disputed parcel was not included in the Cullens' deed or in the contract of sale between the Flynns and the Cullens. Nor was it included in the land survey conducted by Richard J. Domato in 2000 at the Flynns' request. (Domato Decl. [Doc. # 114] Ex. A ("Domato Survey"); *see* Pls. Opp'n Mem. 12.) Plaintiffs have identified no other express or implied agreement to suggest that the Flynns intended to, or even contemplated, conveying the disputed property. Indeed, the Flynn-Cullen deed expressly describes the boundary separating the Cullen and DeLuca properties as running "along the [DeLucas' property line] . . . South 50 Degrees East 191.70 feet to the present high water line of Long Island Sound/Pelham Bay" – coordinates which place the disputed parcel on the DeLucas property. (Defs.' Mem. Ex. 26.) Similarly, the 2000 Domato Survey, which Plaintiffs concede the "deed and contract of sale were [ ] subject to" (Pls.' Opp'n Mem. 10), clearly shows the disputed wedge-shaped parcel lying on the DeLucas' side of the property line (*see* Domato Survey). From these documents alone, it is clear that regardless of what the Flynns may have intended or assumed they were conveying to the Cullens, they "actually" conveyed a parcel of land that did not include the disputed property.

This conclusion is supported by the chain of title leading up to the Flynn-Cullen sale, including the survey taken by the Flynns' predecessors in interest, the Kingsleys (the Flynns' grandparents). As Magistrate Judge Smith noted:

> The survey done in 1950 for John and Helen Kingsley ["the Dearing
> Survey"] . . . shows the boundary line in the same location as the later
> survey done for the Flynns in 2000.

(Report at 12.)  Both the Dearing Survey and the Domato Survey show a North-South boundary

line that extends 191.70 feet from Shore Road to the Long Island Sound, and both place the

disputed parcel on what is now the DeLucas' property.  Moreover, "the Kingsleys' 1950 deed

excludes the encroachment of the house onto the property belonging to 42 Shore Road [the

DeLucas' property], but grants [ ] a quitclaim regarding the encroachment, subject to any claim

of the owners of 42 Shore Road." (*Id.*; *see* Defs.' Mem. Ex. 22.)  Thus, the Cullens' chain of title

clearly excludes the disputed property.  *See Dittmer v. Jacwin Farms Inc.*, 637 N.Y.S. 2d 785,

786 (App. Div. 1996) (contrasting mere silence with specific exclusion).

Thus, there is nothing in the record to suggest that when the Flynns sold to the Cullens,

the Flynns actually turned over the disputed land.  While the Flynns plainly actually turned over

the portion of the house that encroaches on the disputed land, the DeLucas do not dispute the

claim of adverse possession as to the encroaching portion of the house.  As to the remainder of

the wedge of land, however, the record is at best silent.  Indeed, if anything, the record suggests

that the Cullens knew that the Flynns were *not* conveying the disputed land, because the Cullens

were aware that the border of the parcel ran not along the stone wall, but rather adjacent to, and

in part under, the house.  The real estate attorney who represented the Cullens in the purchase of

50 Shore Road took notes of his meeting with the Cullens on December 7, 2000, and those notes

show that he reviewed the Domato Survey with the Cullens; discussed the fact that it showed the

property line to be such that a portion of the house encroached on the neighboring land;

discussed possible adverse possession; and arranged for Maria Cullen to check the town file and

get him the Dearing Survey.  (Deposition of Frank Veith 29:13-24, Ex. 2.)  The attorney also

testified that he discussed with his clients the fact that the Domato Survey showed that the home they intended to purchase ran over the property line and encroached on the neighboring property. (Id. 36:10-37:3; *see id*. 44:3-17.)

Although a question of fact may exist as to whether the Flynns intended to convey the disputed property, as Magistrate Judge Smith found, the DeLucas are correct that "[i]ntent alone is insufficient for tacking, because . . . actual transfer is also required." (DeLuca Defs. Objs. 6.) The deeds, contract of sale, land surveys and surrounding circumstances uniformly show that the disputed parcel of land was never actually conveyed to the Cullens.  Indeed, with the exception of a single document which controls the conveyance of underwater, not inland, property (discussed further below), all documents and surveys associated with the sale of 50 Shore Road place the disputed parcel on the DeLucas' property.  Accordingly, summary judgment in favor of the DeLucas is appropriate on Plaintiffs' adverse possession claim because there is no genuine issue of fact as to whether the Flynns actually conveyed the disputed parcel to the Cullens.

### b.      Improvement and Cultivation of the Disputed Parcel

Even if there were a triable issue of fact as to whether the Flynns "actually" transferred the disputed property, however, the Cullens' adverse possession claim also fails because they cannot show that the disputed parcel was "usually cultivated or improved," as required by New York law.  The extent of the Flynns' "cultivation or improvement" of the disputed parcel amounts to no more than sporadic maintenance.  Warren Flynn testified that his family "would maybe maintain the grass, and the plantings and trim anything . . . to the north of that wall." (Report at 10 (quoting Deposition of Warren K. Flynn, Decl. of Pls.' Attorney in Opp'n to DeLuca Defs.' Mem  Ex. C.).)  Ivy was "simply allowed to grow as dense vegetation," (*id.*), and Bradley Flynn testified that "maintenance, as far as I am concerned, was ivy.  There wasn't a lot

of maintenance that was involved . . . there was never any lawn that had to be mowed." (Report at 10 (quoting Deposition of Bradley T. Flynn, DeLuca Decl. in Support of DeLuca Defs.' Mem. Ex. 14)). Bradley Flynn further testified that "maybe [he] would weed whack." (*Id.*)

New York courts have routinely found this sort of desultory maintenance insufficient to satisfy N.Y. RPAPL § 522's cultivation requirement. In *Yamin v. Daly*, for example, a New York court described the following activities as insufficient:

> [O]ther than conducting an annual garage sale partially on the property and depositing snow on it in the winter months, defendants established only that they *took reasonable steps to keep the site presentable*. When necessary, they trimmed weeds and brush, raked leaves, and removed trash and debris. Two trees were removed. The small area that could support grass . . . was mowed. An occasional flower or plant was placed in another small area and some ground cover was at times established. The only claimed "improvement" of the driveway was winter snow removal and the filling of depressions with gravel as needed.

*Yamin v. Daly*, 613 N.Y.S.2d 300, 300-301 (App. Div. 1994) (emphasis added); *see Simpson v. Kao*, 636 N.Y.S.2d 70, 71 (App. Div. 1995) (proof of "plant[ing] and cultivat[ing] a few trees" in disputed property "insufficient to establish adverse possession by usually cultivating or improving the property in dispute."); *Manhattan Sch. of Music v. Solow*, 571 N.Y.S.2d 958, 960 (App. Div. 1991) (evidence of "unspecified work" to improve disputed area, including "remov[ing] and prun[ing] trees . . . planting sod" and installation of outdoor shower insufficient to show cultivation or improvement); *cf. Birnbaum v. Brody*, 548 N.Y.S.2d 691, 692 (App. Div. 1989) ("[P]roof that grass on the property has been cut exclusively by the party seeking adverse possession may be sufficient to satisfy the statutory requirement of cultivation."). These decisions are consistent with other provisions of the RPAPL, which provide that "*de minimis* non-structural encroachments including . . . hedges, shrubbery, plantings," as well as "acts of

lawn mowing or similar maintenance . . . shall be deemed to be permissive and non-adverse."

N.Y. RPAPL § 543.

\* \* \*

Thus, the record is clear that the Flynns did not adversely possess the disputed property, because they did not cultivate or improve it.  Accordingly, their successors in interest, the Plaintiffs, cannot be said to have obtained title by adverse possession.[2]

Because the undisputed facts make clear that the Plaintiffs cannot show by clear and convincing evidence that the Flynns, their predecessors in title, intended to and actually turned over possession of the disputed parcel, or that the Flynns cultivated or improved the disputed property as required by N.Y. RPAPL § 522, the Court finds that the DeLucas are entitled summary judgment on the Cullens' adverse possession claim.

---

[2] Plaintiffs' claim that the disputed area was enclosed by the stone wall itself, (Pls. Opp'n Mem. 15-16), is also insufficient to establish adverse possession by a "substantial enclosure." The stone wall cannot serve as a "substantial enclosure" because it was built by the DeLucas', not the Cullens', predecessor in title.  *See Mohawk Paper Mills Inc. v. Colaruotolo,* 681 N.Y.S.2d 868, 869 (App. Div. 1998) ("Inasmuch as the erection of the fence was not the result of defendant's conduct as an adverse possessor, it lacked the character of an open and notorious act of possession sufficient to place plaintiff's predecessors-in-title or plaintiff on notice of defendant's adverse claim to the property."); *RSVL Inc.v. Portillo,* No. 013427/05, 2007 WL 2669463, at *3 (N.Y. Sup. Sept. 11, 2007) ("[M]ere presence of a fence is insufficient . . . [the] substantial barrier [must be] erected by the party claiming adverse possession" as "a fence erected by or with the consent of the owner, or its predecessor in title, cannot be utilized by the adverse possessor, because its presence can never serve as an indication of conduct . . . openly hostile to the owner's rights.").

Moreover, undisputed testimony by Sam DeLuca indicates that he routinely crossed the stone wall to enter the disputed area.  (Deposition of Sam DeLuca 94:4-23, DeLuca Decl. Ex. 10 in Support of DeLuca Defs.' Mem.)  DeLuca's repeated entries into the disputed parcel belie any claim that the Cullens' possession was "hostile." *See United Pickle Products Corp. v. Prayer Temple Comm. Church*, 43 N.Y.S.2d 1, 3 (App. Div. 2007) (disputed parcel was walled off and accessible only from adverse possessor's property; "exclusive access renders their possession hostile"); *see also Robarge v. Willett,* 636 N.Y.S.2d 938, 940 (App. Div. 1996) ("[T]o prove hostility . . . [adverse possessor must show] that the possession infringed on the owner's rights, even if inadvertent or by mistake.").

## 2.      Boundary Counterclaims

The DeLucas also object to the Report's recommendation that this Court deny summary judgment on their boundary counterclaims.  To award summary judgment on any of the DeLucas' boundary counterclaims – which comprise (1) a claim for ejectment of the Cullens from the disputed property, (2) a cause of action to compel the determination of a claim to real property, and (3) a claim for declaratory judgment that the disputed property belongs to the DeLucas – requires this Court not only to find the Cullens' adverse possession claim meritless, but also to find that there is no issue of material fact as to the location of the boundary line.

Two operative deeds to the DeLucas' property present different bearings for the boundary separating 42 Shore Road from 50 Shore Road.  An upland partition deed, executed in January 1907, includes a bearing of N36°23'E, which places the boundary north of the stone wall physically dividing the Cullen and DeLuca properties, and this puts the disputed parcel on the DeLucas' land.  (DeLuca Decl. Ex. 20 in Support of DeLuca Defs.' Mem.)  An underwater partition deed, executed in March, 1914, includes a bearing of N35°23'E, which places the boundary at the stone wall itself, and thus puts the disputed parcel on the Plaintiffs' land.  (DeLuca Decl. Ex. 21 in Support of DeLuca Defs.' Mem.)  The underwater partition deed also indicates a course running "to a point in mean high water line where the division line between . . . [the Cullen and DeLuca properties is] the same as defined in [the 1907 upland partition deed]."  (*Id.*)  This inconsistency led Magistrate Judge Smith to find that "an anomalous outcome would result from giving effect to the unambiguous descriptions of the boundaries for the upland and the underwater parcels," thereby presenting a question of fact and foreclosing the possibility of summary judgment on the DeLucas' counterclaims.  (Report at 17.)

13

The DeLucas contend that the language of the underwater partition deed, which expressly invokes and relies upon boundaries set forth in the upland partition deed, supersedes any apparent disparity between the two deeds.  More specifically, the DeLucas assert that language in the underwater partition deed providing that "the underwater parcel runs 'to a point' at the upland boundary, is imperative and forces contiguity and alignment.  The direction 'to' prevails over any bearing, like an irresistible magnet."  (DeLuca Defs. Objs. 15.)  The DeLucas' expert, Glennon J. Watson, writes in his report that "[t]he word 'to' is a very strong and important word in deed descriptions as applied to surveys.  It is a word of exclusion, meaning that, regardless of any seemingly contrary instruction, one must end up at the indicated location.  It is imperative." (DeLuca Defs. Objs. 15, n.10 (quoting Expert Report of Surveyor Glennon J. Watson [Doc. 100].)  The DeLucas urge the Court to adopt Watson's analysis, disregard the bearing on the underwater partition deed, and conclude that no genuine issue of material fact exists as to the boundary between the DeLuca and Cullen properties.

The location of a boundary line typically presents a question of fact, and is not appropriately resolved as a matter of law when conflicting evidence exists.  *See Whipple v. Trail Properties Inc.*, 652 N.Y.S.2d 657, 659 (App. Div. 1997) ("[Q]uestion of fact [exists] as to whether the deed relied upon by plaintiffs indicates the actual location and boundaries of the parcel with enough certainty to support their claim.").  Here, the underwater deed is arguably ambiguous in that its numbered bearing puts the boundary at the stone wall, while it at the same time seems to adopt the bearing of the upland deed, which puts the boundary north of the wall and the disputed parcel on the DeLucas' side.  But the question of fact as to what the underwater deed actually means – whether the parties to the deed meant to divide the underwater land at the

14

same place as the upland deed, or if the 35° reference means the parties intended to run the

underwater boundary in a different place – is only material, and need only be resolved, if the

underwater deed controls or affects this dispute.  If it does not, as a matter of law (as I conclude

below), there is no question of fact precluding summary judgment.

In determining whether the underwater deed should affect the interpretation of the upland

deed, I start with the obvious point that unlike the upland partition deed, the underwater partition

deed relates to underwater property, not land, and should not be used to resolve a boundary

dispute which has nothing to do with underwater property.  Moreover, although the underwater

partition deed sets forth a different bearing, it cannot render the earlier upland partition deed

ambiguous or unclear.  *See New York Life Ins. & Trust Co. v. Hoyt,* 55 N.E. 299, 301 (N.Y.

1899) ("Resort cannot be had to the later deed in order to create an ambiguity in the earlier.");

*see also  Marseilles Hydro Power, LLC v. Marseilles Land and Water Co.,* 518 F.3d 459, 469

(7th Cir. 2008) (under Illinois law, "later deed cannot render an earlier deed ambiguous");

*Modica v. Incorp. Vill. of Saltaire,* 609 N.Y.S.2d 597, 598 (App. Div. 1994) (when "language in

the deed is clear and unambiguous. . . there is no need to look outside the instrument to ascertain

the intention of the parties.").  Accordingly, the upland deed, which places the disputed parcel on

the DeLucas' side of the boundary, controls.[2]

_____

[2] Plaintiffs argue, based on their expert's report, that the underwater partition deed was intended to be a "corrective deed" by which the parties' predecessors in title intended to alter the boundary line clearly set forth in the upland deed.  There are no facts to support this speculation. Had the predecessors intended to alter the upland boundary, it would have been simple enough to do so.  It also would have been simple enough to indicate their intent to do so via the underwater partition deed if they really had such an intent.  Common sense dictates that the one thing that parties intending to alter an earlier deed through use of a later one would *not* do is incorporate into that later deed a reference to the earlier one.

For the foregoing reasons, the Court finds as a matter of law that the N36°23'E  bearing in the upland partition deed is controlling.  This result is supported by the surveys taken by the Parties' predecessors in title, all of which place the disputed parcel on the DeLucas' property. Accordingly, the Court respectfully declines to adopt the Report's recommendation that inconsistencies between the upland and underwater partition deeds' placement of the boundary line present a genuine question of material fact, and grants the DeLucas summary judgment on their boundary counterclaims.

### 3.     Trespass

Because Plaintiffs cannot establish title, by adverse possession or otherwise, to the disputed property, their claim that the DeLucas trespassed cannot be sustained.  Thus, the Court respectfully declines to adopt the Report's recommendation and grants the DeLucas summary judgment on the Cullens' trespass claim.

### D.     The Pelham Defendants' Motion for Summary Judgment

The Cullens allege that the Village of Pelham, acting through Village Manager John Pierpont, unlawfully entered their home on or around February 21, 2001, April 5, 2001, and June 16, 2001.  Magistrate Judge Smith recommended that summary judgment be granted to the Pelham Defendants on Plaintiffs' Section 1983 and trespass claims as to the alleged April and June entries, but not the February entry.  The Pelham Defendants object to the Report to the extent that it recommends that this Court deny summary judgment on Plaintiffs' claims arising from the alleged February 2001 entry.

### 1.      February 21, 2001 Unlawful Entry

The Pelham Defendants offer three arguments that no constitutional violation occurred when Pierpont entered the Cullen home on February 2001: (1) Pierpont had "individualized suspicion" of a violation which rendered his search reasonable; (2) qualified immunity bars the unlawful entry claim; and (3) an earlier decision by another judge of this Court finding that Pierpont was entitled to qualified immunity for the February 2001 entry into the Cullen home bars Plaintiffs' present claim.

### a.      "Individualized Suspicion"

"The Fourth Amendment requires that searches and seizures be reasonable.  A search or seizure is ordinarily unreasonable in the absence of individualized suspicion of wrongdoing." *City of Indianapolis v. Edmond*, 531 U.S. 32, 37 (2000).  The Pelham Defendants argue that Pierpont's "individualized suspicion" after noticing unapproved construction activity rendered his February 2001 entry into and search of the Cullen home lawful.  But their argument that individualized suspicion is a prerequisite to a reasonable search does not mean that it alone is sufficient.  Indeed, it is not.  As discussed below, a warrant or consent is required for an administrative search, whether or not probable cause or individualized suspicion is present.

It is well established that warrantless administrative searches constitute "significant intrusions upon the interests protected by the Fourth Amendment." *Camara v. Municipal Court of City and County of San Francisco,* 387 U.S. 523, 534 (1967); *see Payton v. New York,* 445 U.S. 573, 585 (1980) ("[P]hysical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." (internal quotation marks omitted)); *see also Steagald v. United States*, 451 U.S. 204, 214 n.7 (1981) ("[A]bsent exigent circumstances or consent, an entry into a private dwelling to conduct a search or effect an arrest is unreasonable without a

17

warrant").  Indeed, administrative searches "when authorized and conducted without a warrant procedure lack the traditional safeguards which the Fourth Amendment guarantees to the individual. . . ." *Camara*, 387 U.S. at 534.  In *Camara*, the Supreme Court reasoned that allowing warrantless searches of private dwellings as part of housing code inspections leaves "the occupant subject to the discretion of the official in the field," with the sole recourse being "refusing [the official] entry and risking a criminal conviction."  *Id*. at 532-33.  In such situations, "[w]hen the inspector demands entry, the occupant has no way of knowing whether enforcement of the municipal code involved requires inspection of his premises, no way of knowing the lawful limits of the inspector's power to search, and no way of knowing whether the inspector himself is acting under proper authorization." *Id*.  Accordingly, it held that such searches require a warrant or the owner's consent.  *See id.* at 528-29.[3]

Here, Pierpont allegedly entered the Cullen home without a warrant, and threatened workers at the Cullen home with arrest if they did not comply with his requests.  (Pierpont Letter, Declaration of Anthony B. Corleto ("Corleto Decl.") in Support of Pelham Defendants' Motion for Summary Judgment ("Pelham Defs.' Mem.") Ex. H.)  The Pelham Defendants maintain that Pierpont "noticed construction activity at the [Cullen] home, recalled that a building permit had not been requested or issued, and saw no permit posted at the premises."

---

[3] The *Camara* Court made clear that probable cause (let alone "individualized suspicion") would not alone suffice, but would form the basis for the issuance of a warrant. "In determining whether a particular inspection is reasonable – and thus in determining whether there is probable cause to issue a warrant for that inspection – the need for the inspection must be weighed in terms of these reasonable goals of code enforcement." *Camara*, 387 U.S. at 535.  Thus, "'probable cause' to issue a warrant to inspect must exist if reasonable legislative or administrative standards for conducting an area inspection are satisfied with respect to a particular dwelling." *Id*. at 538.  The Court concluded that when "a valid public interest justifies the intrusion contemplated,   [ ] there is probable cause to issue a suitably restricted search warrant." *Id.* at 539.

(Pelham Defendants' Objections to Magistrate Judge's November 28, 2008 Report and Recommendation ("Pelham Defs. Objs.") 4.)  Although this may have provided Pierpont with suspicion that construction was occurring without a building permit, an isolated "individualized suspicion" does not, as *Camara* made clear, render reasonable an otherwise unauthorized and warrantless entry into, and search of, private property.  Indeed, it is by no means clear that the mere presence of vans parked outside the Cullens' home would be sufficient to create an individualized suspicion of unauthorized construction activity in the first place.  But even if it were, the circumstances under which Pierpont noticed the construction activity and entered the home are disputed: for example, the Pelham Defendants allege that Pierpont was invited in by the Cullens' workers (Pelham Defs. Objs. 3); at least one of these workers, however, testified that Pierpont entered without warning and proceeded to search the second floor of the Cullen home without consent (Report at 22 (citing Decl. of Pls.' Attorney in Opp'n to DeLuca Defs.' Mem Exs. L-M)).  Whether or not Pierpont suspected the Cullens of violating the Pelham Building Code, he was not authorized to act on that suspicion by entering and searching the Cullen home without a warrant or consent.  Accordingly, the Pelham Defendants have failed to establish that there is no genuine issue of material fact as to whether Pierpont lawfully entered the Cullen home on February 21, 2001.

### b.    Qualified Immunity

The Pelham Defendants also argue that "even if there is an issue of fact as to the event in question, qualified immunity insulates Pierpont." (Pelham Defs. Objs. 4.)  "Qualified immunity protects officials from liability for civil damages as long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Gilles v. Repicky,* 511 F.3d 239, 243 (2d Cir. 2007) (internal quotation marks omitted).  In

assessing whether a party is entitled to qualified immunity, the court can consider both "whether plaintiff's allegations, if true, establish a constitutional violation," *Hope v. Pelzer,* 536 U.S. 730, 736 (2002), and "whether the right was clearly established" at the time of defendant's alleged misconduct, *Saucier v. Katz,* 533 U.S. 194, 200 (2002). Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan,* 129 S. Ct. 808, 818 (2009).

Pierpont will be entitled to qualified immunity only if "it was objectively reasonable for him to believe that his actions did not violate clearly established law." *Iqbal v. Hasty*, 490 F.3d 143, 152 (2d Cir. 2007); *see Saucier,* 533 U.S. at 208 (officer entitled to qualified immunity if "[a] reasonable officer in [his] position could have believed that [the challenged conduct] was within the bounds of appropriate police responses"). The Court's inquiry "turns on the objective legal reasonableness of the action, *assessed in light of the legal rules that were clearly established at the time it was taken*." *Pearson*, 129 S. Ct. at 822 (emphasis added and internal quotation marks omitted); *see Laverne v. Corning,* 522 F.2d 1144, 1149 (2d Cir. 1975) ("qualified immunity is based on the common-sense rationale that the public interest requires that public officials be able to carry out their discretionary duties and act decisively without the intimidation that would result if good-faith errors in judgment were later to subject them to liability for damages.").

The Pelham Defendants take issue with the Magistrate Judge's conclusion that fact issues exist as to whether it was objectively reasonable for Pierpont to believe his actions did not violate clearly established law. (*Id.*) Their only argument is that "Plaintiffs have not presented any such precedent that a warrantless search, of ongoing construction where a suspicion of

wrongdoing is present, is per se unconstitutional." (Pelham Defs.' Objs. 6.) Whether or not Plaintiffs presented any legal precedent, however, does not alter the fact that the constitutional right implicated by Pierpont's entry was clearly established by 2001. *See Wilson v. Layne,* 526 U.S. 603, 614 (1999) (clearly established "means that the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right"). Indeed, the right to be free from a warrantless search of a private dwelling executed under color of municipal building law has been clearly established for decades, as both the Supreme Court and the New York Court of Appeals long ago recognized that the Fourth Amendment protects the owner of a private dwelling from warrantless administrative inspections of that dwelling. *See Camara,* 387 U.S. at 534; *see also New Jersey v. T.L.O.*, 469 U.S. 325, 335 (1985) ("As we observed in [*Camara*] . . . [t]he basic purpose of [the Fourth] Amendment, as recognized in countless decisions of this Court, is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials." (internal quotation marks omitted)); *Sokolov v. Village of Freeport,* 52 N.Y.2d 341, 345-46 (1981) (finding "rental permit ordinance . . . unconstitutional insofar as it effectively authorizes and . . . requires a warrantless inspection of residential rental property"). Accordingly, the Pelham Defendants cannot argue that it was not clearly established at the time of the events giving rise to this action that the Fourth Amendment warrant requirement applied to administrative searches such as Pierpont's search of the Cullen home. If, however, Pierpont had an objectively reasonable belief that (1) he was authorized to conduct a warrantless search without consent, or (2) he had consent to search from an individual authorized to give it, he is entitled to qualified immunity.

### i.        Search Without Consent

With respect to whether Pierpont had an objectively reasonable belief that he was not

violating clearly established law by searching the Cullen home without consent or a warrant, the

Pelham Defendants explain that Pierpont's entry into and search of the Cullen home was

conducted pursuant to Section 72-2 of the Pelham Village Building Code, which expressly

provides a "Right of Entry" authorizing building inspectors "to enter any building, structure or

premises at any reasonable hour" in discharging their duties.  (Pelham Building Code, Corleto

Decl. in Support of Pelham Defs.' Mem. Ex. M)   These duties include the enforcement of "all

laws relating to the construction, alteration, repair, removal, demolition, equipment, use and

occupancy, location and maintenance of buildings and structures," and the inspection "during

construction, [of] all buildings or structures for which a permit has been issued to see that the

provisions of law are complied with." (*Id*.)  A building inspector may, upon finding any

"defective or illegal work [occurring] in violation" of the Pelham Building Code, "order all

further work to be stopped and may require suspension of work." (*Id*.)  This statute is plainly

unconstitutional in light of *Camara*.

Further, Plaintiffs have offered an affidavit prepared by a licensed architect and certified

New York Code Enforcement Official, stating, among other things, that according to the

Property Maintenance Handbook, published by the the New York State Conference of Mayors

and Municipal Officials, Code Enforcement Officials ("CEOs") such as Pierpont are trained that

"[r]egardless of whether a municipality has established a local law authorizing its CEOs to enter

onto private property . . . *all* incursions on private property are subject to [federal and state

constitutional] . . . prohibitions against unreasonable searches and seizures." (Affidavit of Noel

Shaw, Jr. ("Shaw Aff."), Decl. of Pls.' Attorney in Opp'n to Pelham Defs.' Mem  Ex. B.) Under

this portion of the Property Maintenance Handbook, Shaw asserts, each CEO would know that

"consent or a warrant must be obtained for each and every incursion onto private property." (*Id.*)

In view of the well-established and fundamental nature of the constitutional rights at

issue here, the Court cannot find that Pierpont is entitled to qualified immunity on the issue of

Pierpont's authority to search without a warrant or consent.  The Supreme Court first held such

administrative searches unlawful more than 40 years ago.  Nearly 20 years ago, the New York

Court of Appeals held unconstitutional an ordinance narrower in scope than Section 72-2 of the

Pelham Building Code.  *See Sokolov,* 52 N.Y.2d 341, at 345-46 (declaring unconstitutional

ordinance that did not directly authorize warrantless administrative search, but provided that

rental permits were obtainable only by those who consented to a search of rental property within

two days of notification of vacancy).  Moreover, there is evidence that New York CEOs are

affirmatively made aware that a warrant is required to conduct an administrative search of a

private dwelling (Shaw Aff. 6), although Pierpont testified that he was personally ignorant as to

whether any such requirement existed (Pierpont Dep. 41:6-10).  Even if Pierpont himself was

unaware of the applicable law, an objectively reasonable CEO would not have been.

The argument that the unconstitutional conduct in *Camara* and *Sokolov* differed from

Pierpont's conduct, and thus it was not clear that what Pierpont allegedly did was improper, is

also unavailing, as "a court need not have passed on the identical conduct in order for its

illegality to be 'clearly established.'" *Warren v. Keane,* 196 F.3d 330, 333 (2d Cir. 1999); *see

Johnson v. Newburgh Enlarged School Dist.*, 239 F.3d 246, 251 (2d Cir. 2001) ("[A]bsence of

legal precedent addressing an identical factual scenario does not necessarily yield a conclusion

that the law is not clearly established.").  Indeed, "it stands to reason that in many instances the

absence of a reported case with similar facts demonstrates nothing more than widespread compliance with the well-recognized applications of the right at issue on the part of government actors." *Johnson*, 239 F.3d at 251 (internal quotation marks omitted).  And, in any event, the conduct at issue here is remarkably like that at issue in *Camara*.

**ii.      Consent**

Although the Pelham Defendants do not directly advance the argument in their Objections to the Report, Pierpont could be entitled to qualified immunity if he had an objectively reasonable belief that the Cullens' workers consented to his search of the Cullen home and were authorized to do so.

A warrantless search of a private dwelling can be lawful if it is conducted pursuant to valid consent, *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973), which may be given by someone with common authority over, or sufficient relationship to, the premises to be searched, *United States v. Matlock*, 415 U.S. 164, 171 (1974); *see Illinois v. Rodriguez,* 497 U.S. 177, 188 (1990) (search is constitutional when "facts available to the officer[s] ... [would] warrant a man of reasonable caution in the belief that the consenting party had authority over the premises" (internal quotation marks omitted)); *Moore v. Andreno*, 505 F.3d 203, 209 (2d Cir. 2007) ("Even if a third party lacks actual authority to consent to a search of a particular area, he still may have apparent authority to consent to the search."); *Charles v. Odum,* 664 F. Supp. 747, 751 (S.D.N.Y. 1987) ("[V]alid third-party consent requires only that the third party have 'common authority' over the premises searched and that his consent be voluntary." (internal quotation marks omitted)). Thus, "a police officer's objectively reasonable belief that he has obtained consent, even if in fact he has not, renders a search constitutional." *Moore,* 505 F.3d at 209.  In this Circuit, an officer's objectively reasonable belief that he has consent to search must not,

24

however, be premised upon an erroneous view of the law; rather, under *Rodriguez*, the "apparent authority rule applies [only] to mistakes of fact [and] not mistakes of law." *Id.* (internal quotation marks omitted).  Under this standard, "[a]n investigator's erroneous belief that landladies are generally authorized to consent to a search of a tenant's premises could not provide the authorization necessary for a warrantless search." *United States v. Brown,* 961 F.2d 1039, 1041 (2d Cir. 1992).

Generally, a third party "has authority to consent to a search of a home when that person (1) has access to the area searched and (2) has either (a) common authority over the area, (b) a substantial interest in the area, or (c) permission to gain access to the area." *Moore,* 505 F.3d at 208-209.  Apparent authority exists when, under the totality of the circumstances, "the facts available to the officers at the time they commenced the search would lead a reasonable officer to believe the third party had authority to consent to the search." *United States v. Andrus*, 483 F.3d 711, 717 (10th Cir. 2007).  In situations "where an officer is presented with ambiguous facts related to authority, he or she has a duty to investigate further before relying on the consent." *United States v. Kimoana*, 383 F.3d 1215, 1222 (10th Cir. 2004); *see United States v. Whitfield*, 939 F.2d 1071, 1075 (D.C. Cir. 1991) (emphasis omitted) ("The burden [of proving effectiveness of consent] cannot be met if agents, faced with an ambiguous situation, nevertheless proceed without making further inquiry.").

In *United States v. Nicoletti,* for example, an independent contractor, Raymond Huggins, was employed to remove piping from a building owned by Philadelphia Suburban Development Corporation.  870 F. Supp. 96, 99 (E.D. Pa. 1994).  The court observed that Huggins "was simply a one person independent contractor" who, although "he had a key to . . . enter and exit the property with his truck, [ ] had authority only to remove the pipe and nothing more." *Id.*

25

Having told the FBI agents that he was engaged for this limited purpose only, Huggins thus lacked actual or apparent authority to consent to a search of the building by FBI agents. *Id.*

Here, the facts surrounding the alleged consent, as well as the apparent authority for it, are disputed. According to Pierpont, he observed "significant construction being done at 50 Shore Road" (although it is unclear what he observed beyond the work vans outside the Cullen home, one of the occupants of which is himself a contractor), and "did not recall issuing a building permit for work at that location." (Pierpont Letter.) He investigated by walking to the front door and entering after allegedly being invited inside by the Cullens' workers. (November 20, 2007 Deposition of John Pierpont ("Pierpont Dep.") 30:8-24.) At that time, he "determine[d] that a building permit had not been issued," ordered the workers to cease construction, and "returned to [his] office and wrote a formal stop work order." (Pierpont Letter.)

The Pelham Defendants' proposed sequence of events differs from Franklin DeJesus's testimony in a related matter. (*See* Deposition of Franklin DeJesus ("DeJesus Dep."), Decl. of Pls.' Attorney in Opp'n to DeLuca Defs.' Mem  Ex. M). DeJesus was one of the individuals working on the Cullen home when Pierpont entered on February 21, 2001. DeJesus testified that William Cullen instructed him "not to let nobody [sic] in." (DeJesus Dep. 65:24.) He testified that Pierpont "opened the door" (*id.* 67:13-16), without knocking (*id.* 69:12-16). The first question Pierpont asked was "[W]ho was in charge," to which DeJesus replied, "[A]t the moment I was in charge." (*Id.* 69:17-24.) Without asking whether the workers had a construction permit (*id.* 74:11-13), or to speak to the owners of the house (*id.* 74:14-16), Pierpont allegedly proceeded to round up the Cullen workers and search the Cullen home. After telling the workers they weren't supposed to be working and had "no right to work in there," (*id.* 73:9-15), DeJesus allegedly told Pierpont he would "call [his] boss," (*id.* at 74:21-22). At this point, Pierpont

26

allegedly became angry, and instructed DeJesus not to call anyone.  (*Id.* 74:21-75: 3.)  According to DeJesus, Pierpont threatened the workers with arrest if they did not suspend their work and vacate the premises.  (*Id.* 69:3-9.)  The inconsistencies between DeJesus's version of events and Pierpont's raises a question of fact not only as to whether the Cullens' workers ever consented to the search, but also whether the Cullens' workers had actual or apparent authority to consent to a search of the Cullen home at all.

Indeed, DeJesus's statement that he was "in charge," was not alone sufficient for Pierpont to rely upon as authority to consent to a search of the Cullen home.  *See United States v. Corral,* 339 F. Supp. 2d 781, 795 (W.D. Tex. 2004) (finding affirmative response by third party to inquiry as to who was "in charge . . . too vague to constitute an erroneous factual assertion on which the agents could rely to support a determination of apparent authority to consent to a search.").  Moreover, the presence of the very work vans which supposedly prompted Pierpont's scrutiny in the first place might have strongly suggested that the occupants of the Cullen home at that time were workers, rather than owners, and not empowered to consent to a search.  *See United States v. Davis,* 332 F.3d 1163, 1170 (9th Cir. 2003) (officers' awareness of known facts obviated any possible mistake of fact in concluding that third party had authority to consent to search); *United States v. Basinski*, 226 F.3d 829, 835 (7th Cir. 2000) (finding any possible reasonable belief by officers in apparent authority of a third party was negated by other contemporaneous statements made by the third party); *but see Montville v. Lewis,* 87 F.3d 900, 903 (7th Cir. 1996) (*en banc*) (finding "issue of third party consent to administrative inspections was not so 'sufficiently particularized [as] to put [the] defendants on notice that their conduct [was] probably unlawful' . . . when they entered [Plaintiff's] house with [ ] contractor's consent.").  Ultimately, whether the Cullens' workers had actual or apparent authority to

27

consent, and voluntarily gave that consent, presents questions of fact that cannot be resolved on this record.  *See United States v. Gandia,* 424 F.3d 255, 265 (2d Cir. 2005) (remanding case for district court to make additional factual findings and conclude whether defendant consented to search of apartment); *see also United States v. Hall,* 507 F. Supp. 242, 246 (M. D. Fla. 1980) ("[E]xistence of authority or consent is always a question of fact.").  Likewise, whether, based on the state of the law in 2001, Pierpont had an objectively reasonable belief that he had obtained valid consent cannot be determined without resolving disputed factual issues.

The Court cannot find, on this record, that there is no genuine issue of material fact as to whether Pierpont had an objectively reasonable belief that (1) the Cullens' workers had apparent or actual authority to consent to his search, and (2) the Cullens' workers in fact consented to the search.

Thus, the Court denies the Pelham Defendants' motion for summary judgment with respect to Pierpont's alleged February 2001 entry of the Cullen home.  The Court need not reach the Pelham Defendants' argument as it relates to an earlier decision involving the events of the same day, other than to observe that the instant lawsuit presents different claims, by different plaintiffs, arising from different actions.[4]

---

[4] In *DeJesus v. Village of Pelham Manor*, this Court found the following with respect to Pierpont's February 2001 entry into the Cullen home:

> Pierpont inspected the Premises in accordance with the Building Code to determine whether Plaintiffs had a proper permit for the work they were conducting.  Therefore, regardless of the alleged unconstitutionality of the Building Code, Pierpont is protected by qualified immunity for inspecting the Premises since he was acting reasonably in accordance with the village ordinance.

*DeJesus v. Village of Pelham Manor,* 282 F. Supp. 2d 162, 174 (S.D.N.Y. 2003).  The plaintiffs in that case, which is not binding precedent, were the Cullens' workers and it was undisputed that they did not have standing to assert a claim with respect to Pierpont's search

28

### 2.        Other Alleged Unlawful Entries

Having conducted a review of the portion of the Report recommending that this Court

award the Pelham Defendants summary judgment on Plaintiffs' claims arising from Pierpont's

April and June 2001 entries and finding no clear error, I adopt it as the decision of the Court.

### 3.        Procedural Due Process

Magistrate Judge Smith recommended in her Report that summary judgment be awarded

to the Pelham Defendants on Plaintiffs' procedural due process claims arising from the rescission

of a stop work order on a building permit issued to the DeLucas for construction on the disputed

parcel.  Upon review, the Court finds no clear error and grants the Pelham Defendants summary

judgment on Plaintiffs' procedural due process claim.

### 4.        Trespass

The Pelham Defendants did not object to the Report's recommendation that their motion

for summary judgment on Plaintiffs' claim should be denied with respect to the alleged trespass

on February 21, 2001, but granted in all other respects. Having reviewed this portion of the

Report for clear error and finding none, I adopt it as the decision of the Court.  The same

circumstances that preclude summary judgment on the unlawful entry claim preclude summary

judgment on the trespass claim arising from the same event.

### 5.        Environmental Trespass

 Magistrate Judge Smith recommended in her Report that this Court grant the Pelham

Defendants summary judgment on Plaintiffs' environmental trespass claim.  Having reviewed

---

of the Cullen home, thereby rendering the above statement *dictum*.  Moreover, because the
claims, issues, and parties were different, the case thus has no *res judicata*, collateral
estoppel or law of the case effect in this action brought by other individuals.

this portion of the Report for clear error and finding none, I adopt it as the decision of the Court.

### E.      The Cullens' Motion for Summary Judgment

Plaintiffs have not objected to the portion of the Report recommending that this Court deny the Cullens' motion for summary judgment.  Accordingly, I have reviewed it for clear error, and finding none, adopt it as the decision of the Court.

### F.      The DeLucas' *Daubert* Motions

The DeLucas argue that the testimony and reports of Plaintiffs' real estate appraisal expert, Frank Palumbo, and engineering expert, Vincent Ettari, should be excluded under *Daubert v*. *Merrell Dow Pharms*., *Inc*., 509 U.S. 579, 589 (1993).  Although it is unclear whether these experts will be needed in light of the disposition above, where the only remaining issues for trial are (1) the DeLucas' fourth counterclaim for property damage, and (2) the Cullens' unlawful entry claims against the Village of Pelham arising from Pierpont's February 2001 entry, the Court nonetheless addresses the issue and finds no clear error in Magistrate Judge Smith's ruling denying the DeLucas' *Daubert* motions.

####           1.       Standard of Review

In reviewing an expert report, the court has a duty to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."  *Daubert*, 509 U.S. at 589;  *see Kumho Tire Co*. *v*. *Carmichael*, 526 U.S. 137 (1999).  Under Rule 702 of the Federal Rules of Evidence, a qualified expert may testify in the form of opinion or otherwise "[i]f scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702.  The Supreme Court has explained that the objective of the "gatekeeping" requirement of *Daubert* and Rule 702 is "to make certain that an

expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152.  Courts may consider several factors bearing on reliability in undertaking a Rule 702/*Daubert* analysis, including whether the theory or technique in question "can be (and has been) tested," whether it has been "subjected to peer review and publication," its "known or potential rate of error" and "the existence and maintenance of standards controlling the technique's operation," and whether it has attracted "[w]idespread acceptance" within a relevant scientific community. *Daubert*, 509 U.S. at 593-94. No list of specific factors, however, "necessarily nor exclusively applies to all experts or in every case." *Kumho Tire*, 526 U.S. at 141.  Rather, "the district court's inquiry into the reliability of expert testimony under Rule 702 is a 'flexible one.'" *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007) (quoting *Daubert*, 509 U.S. at 594).  Thus, the court must examine both the bases for, and the path by which an expert reaches his conclusions.  *See Faulkner v. National Geographic Soc.*, 576 F. Supp. 2d 609, 619 (S.D.N.Y. 2008) (district court must determine "whether the testimony is grounded in sufficient facts").  The analysis is a fluid and probing one, and must peer beyond any artifice of credentials and conclusions to the factual edifice upon which each opinion is built.

Applying this gatekeeping function to the Palumbo and Ettari Reports, the Court finds that Magistrate Judge Smith did not clearly err in denying the DeLucas' *Daubert* motions.

### 2.   Discussion

#### a.   Palumbo Report

The DeLucas seek to exclude the reports and testimony of Frank Palumbo, who provided an opinion as to the value of the Cullens' property.  The crux of the DeLucas' challenge to

Palumbo's testimony and report is that his valuation of the Cullen home was "predicated on averaging dozens of sales prices of properties, which he admitted included properties dissimilar to plaintiffs'." (DeLuca Defs. Objs. 18.)  Palumbo explained that he considered unlike properties because "there were no comparable sales during the relevant time periods." (Report at 30.)  The DeLucas allege that this method of appraisal is not only unreliable, but illegal.  (DeLuca Defs. Objs. 19.)  Magistrate Judge Smith rejected this argument, remarking that "[w]hatever the DeLucas might argue about the way in which Palumbo employed the sales comparison approach, that does not render his reports or testimony inadmissible." (Report at 30).

Other than the market data approach, which Palumbo described as a variant of the "sales comparison" approach, two other methods are available to appraisal experts.  Using the cost approach, an expert bases his or her appraisal on "the proposition that the informed purchaser would pay no more than the cost of producing a substitute property with similar utility as the subject property." (DeLuca Decl. Ex. 41 ("Palumbo Report") in Support of DeLuca Defs.' Mem. 25.)  Palumbo declined to utilize this method because of "the absence of available vacant land and the subjectiveness in estimating depreciation," which are necessary to employ the cost approach.  The income approach "converts anticipated benefits (dollar income or amenities) to be derived from the ownership of property into a value estimate."  (*Id*.) Palumbo did not use the income approach because "[t]he subject property is a single family residential dwelling and not considered typical of an income producing property."  (*Id.*)

The market data approach, by contrast, is "an appraisal procedure in which the market value estimate is predicated upon prices paid in actual market transactions and current listings." (Palumbo Report 25.) In formulating his appraisal using this approach, Palumbo considered 14

32

properties sold in 2000 and 18 properties sold in 2007.  (*Id.* at 36-69.)  Each of the properties considered was situated within three miles of the Cullen home at 50 Shore Road and of comparable size and dimensions.  (*Id.*)  Most of the properties considered in the 2000 determination were sold for less than $1 million, the approximate value of the Cullen property in 2002, and all but 6 of 18 properties considered in 2007 cost less than $1.55 million dollars, the approximate value of the Cullen property in 2007.  Palumbo's analysis led him to conclude that damage to the Cullen property caused a diminution of value approaching $400,000.  (*Id.* at 1-2.)

While opinions based on pure speculation must be excluded, "[d]isputes as to . . . faults in [an expert's] use of [a particular] methodology, or lack of textual authority for his opinion, *go to the weight*, *not the admissibility*, of his testimony." *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995) (emphasis added).  Palumbo's reliance on sales of nearby properties, which  were in some material respects unlike the Cullen home, did not sufficiently undermine the reliability of his report as to render it inadmissible.  The DeLucas rely on *Latham Holding Co. v. State*, 209 N.E. 2d 542, 543 (N.Y. 1965), in support of their argument that Palumbo's approach was illicit.  In *Latham*, however, the court described as illegal an appraisal method that considered as "similar" properties valued more than "four times the value" of the property being appraised.  *Id.* at 45.  Here, Palumbo used market data for homes in the same general price range and the same neighborhood as the Cullens' home.  His use of the market data approach appears to have been driven only by the difficulty in applying other appraisal methods and finding similar properties, rather than an attempt to artificially inflate the valuation for the Cullen home (and any concomitant diminution of value).

The DeLucas argue that "[t]he 'bible' of the appraisal industry, *The Appraisal of Real Estate* . . . disapproves of what [Palumbo] did at every turn."  (DeLuca Defs. Objs. 19.)  A

33

review of *The Appraisal of Real Estate* (the "Appraisal Guide"), however, shows that the matter is not so clear.  The Appraisal Guide provides, for instance, that "[t]he goal is to find a set of comparable sales *as similar as possible* to the subject property." (*The Appraisal of Real Estate*, DeLuca Decl. Ex. 46 in Support of DeLuca Defs.' Mem. (emphasis added).)  For a single-family residential property, the appraisal guide offers that "typical units of comparison" include total property price and price per square foot of living area, two criteria that Palumbo used in his valuation of the Cullens' home.  (*Id.*)  The Appraisal Guide further provides that once an appraiser has ascertained how similar or different the compared properties are, he or she should "adjust[] their price for differences in various elements of comparison" and "reconcil[e] multiple value indications into a single value or range of values." (*Id.*) Appraisers may make such adjustments because it is "rarely the case" that "all comparable parties are identical to the subject property." (*Id.*) Given that the guide expressly allows for comparison to unlike properties, the DeLucas' claim that Palumbo's report suffered from "illegality and wholesale unreliability,"(DeLuca Defs. Objs. 19), is at least an overstatement.

A court "should only exclude the evidence if the flaw is large enough that the expert lacks good grounds for his or her conclusions." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002).  Palumbo clearly used the market data approach because of a dearth of information necessary for the other approaches.  His methodology led him to consider similar, though not identical, properties that fall within the same geographical area, general size and price ranges as the Cullen home.  Accordingly, the Court finds that Judge Smith did not clearly err in denying the DeLucas' *Daubert* motion to exclude the testimony and expert report of the Cullens' appraisal expert.

        **b.**      **Ettari Report**

The DeLucas also object to the Report's denial of Defendants' *Daubert* motion to exclude the report and testimony of Vincent Ettari, Plaintiffs' engineering expert.  The DeLucas argue that Ettari's conclusion that building activity by the DeLucas damaged the Cullens' foundation lacked a causal connection, and that his "justification for cause and effect was the assertion that 'anything that occurs within six feet of that wall . . . will have an effect on the wall." (DeLuca Defs. Objs. 20.)  This argument has its basis in the "time-lag between the events in question [and] when the damage was discovered, and what might have occurred during the intervening years before Ettari became involved in the case."  (Report at 33-34).

The DeLucas' attacks on the Ettari report are typical of questions suitable for cross-examination, but do not form the bases of a successful *Daubert* challenge.  Any supposed faults in the Ettari's methodology go to the "weight, not the admissibility, of his testimony." *McCullock*, 61 F.3d at 1044.  Although he did not spell out the causal link between the DeLucas' construction activity and the forces acting on the Cullens' foundation, Ettari laid out the nature of the forces, and the effect the forces had on local materials.  Ettari's theory is that the south side of the Cullens' foundation is composed of dry stack field stones called "Ashlar" which, though highly resistant to the compressive forces naturally exerted by a home or building, have "very little resistance against [the] tensile forces" which the DeLucas' construction activity allegedly exerted. (DeLuca Decl. Ex. 35 ("Ettari Report") in Support of DeLuca Defs.' Mem. 36.)  Ettari concluded that:

> When the contractor engaged by [the DeLucas] excavated holes
> immediately adjacent to the south foundation wall of the Cullen
> Dwelling, that contractor imposed tensile forces in the foundation
> wall which the ashlar matrix could not withstand.  As a result, stones

> [ ] popped out of the matrix of the foundation wall, leaving that
> foundation wall in a weakened condition.

(Ettari Report 50.) The Court finds no clear error in Judge Smith's conclusion that "[i]n the end,

'[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the

burden of proof are the traditional and appropriate means of attacking shaky but admissible

evidence.'" (Report at 34.)

### G.      The Cullens' *Daubert* Motions

Plaintiffs have not objected to the portion of the Report denying their *Daubert* motions

seeking preclusion of the DeLucas' experts, and accordingly I have no occasion to review that

ruling.

## III.    Conclusion

It is hereby ORDERED that Magistrate Judge Smith's Report dated November 28, 2008,

is adopted as the decision of the Court to the extent that it is consistent with this Order.  The

Clerk of Court is respectfully directed to terminate the pending motions (Docs. 85, 95, and 98).

**SO ORDERED.**

Dated: May 27, 2009
      White Plains, New York

_____
CATHY SEIBEL, U.S.D.J.

36